# In the United States Court of Federal Claims

OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * *  *
AMANDA GUERRERO,                       *
                                       *   No. 12-689V
              Petitioner,              *   Special Master Christian J. Moran
                                       *
v.                                     *   Filed: September 23, 2014
                                       *
SECRETARY OF HEALTH                    *   Attorneys' fees and costs;
AND HUMAN SERVICES,                    *   comparisons to other cases; expert's
                                       *   reasonable hourly rate and reasonable
              Respondent.              *   number of hours.
                                       *
* * * * * * * * * * * * * * * * * * *  *
```

Lisa A. Roquemore, Law Offices of Lisa A. Roquemore, Irvine, CA, for Petitioner.
Lara A. Englund, United States Dep't of Justice, Washington, DC, for Respondent.

## **DECISION AWARDING ATTORNEYS' FEES AND COSTS**[1]

      Ms. Guerrero claimed that the influenza ("flu") vaccine caused her Guillain-Barré syndrome ("GBS"). She received compensation and now seeks an award of attorneys' fees and costs, totaling $65,857.40. The Secretary argues the amount requested is excessive. Because special masters are allowed to award only a "reasonable" amount of fees and costs, Ms. Guerrero's request is reduced to $48,779.61.

### I.   Standards for Adjudicating Fee Applications

      Attorneys present their fee application by seeking an hourly rate that is multiplied by the time spent. See Avera v. Sec'y of Health & Human Servs., 515

---

[1] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002), requires that the Court post this decision on its website. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

F.3d 1343 (Fed. Cir. 2008). Because the Vaccine Act authorizes special masters to award only "reasonable" attorneys' fees, special masters may revise attorneys' submissions either by decreasing the hourly rate, decreasing the number of hours, or both. E.g. Masias v. Sec'y of Health & Human Servs., 634 F.3d 1283 (Fed. Cir. 2011).

Special masters are authorized to consider their past experiences with attorneys in the Vaccine Program. See Saxton v. Sec'y of Health & Human Servs., 3 F.3d at 1517, 1521 (Fed. Cir. 1993); Wasson v. Sec'y of Health & Human Servs., 988 F.2d 131 (Fed. Cir. 1993) (unpublished). Saxton illustrates this principle. In Saxton, the special master reduced the petitioner's request for attorneys' fees by 50 percent because he found the number of overall hours billed to be unreasonable. Saxton, 3 F.3d at 1518. On appeal, the petitioner argued that this reduction was arbitrary and capricious because the special master failed to evaluate the fee request independently and relied instead on an analysis of previous fee awards and his belief that the petitioner's attorneys had inflated their fees in the past. Id. at 1520. The Federal Circuit held, "[i]t was well within the special master's discretion to reduce the hours to a number that, in his experience and judgment, was reasonable for the work done." Id. at 1521. Consequently, the Federal Circuit approved the reduction in attorneys' fees.

Since Saxton, special masters have occasionally exercised their discretion to award less attorneys' fees than requested and, on those occasions, the Court of Federal Claims has found the special masters' decisions not arbitrary. Guy v. Sec'y of Health & Human Servs., 38 Fed. Cl. 403, 406 (1997) (affirming special master's reduction in the number of hours from 515.3 hours to 240 hours); Edgar v. Sec'y of Health & Human Servs., 32 Fed. Cl. 505 (1994) (affirming special master's awarding only 58 percent of the numbers of hours for which compensation was sought).[1]

Special masters are not required to assess fee petitions on a line-by-line basis. See Saxton, 3 F.3d at 1521 (approving special master's elimination of 50 percent of the hours claimed). Moreover, in reducing the number of hours allowed, a trial court is not required to explain how many hours are appropriate for any given task. Praseuth v. Rubbermaid, Inc., 406 F.3d 1245, 1259 (10th Cir.

---

[1] In other contexts, judges at the Court of Federal Claims have also reduced the number of hours in requests for attorneys' fees by percentages. See, e.g., Town of Grantwood Village v. United States, 55 Fed. Cl. 481, 489 (2003) (reduction of 30 percent for supplemental fee petition); Presault v. United States, 52 Fed. Cl. 667, 681 (2002) (reduction of 20 percent of the total requested fee).

2

2005); Mares v. Credit Bureau of Raton, 801 F.2d 1197, 1202–03 (10th Cir. 1986) (affirming district court's reduction in the number of hours claimed for pre-trial preparation by 77 percent). When the trial court uses a percentage reduction, the trial court should provide a "'concise but clear' explanation of its fee reduction." Internat'l Rectifier Corp. v. Samsung Electronics, Co., 424 F.3d 1235, 1239 (Fed. Cir. 2005) (quoting Gates v. Deukmejian, 987 F.2d 1392, 1400 (9th Cir. 1993) and following Ninth Circuit law).

Special masters have extensive experience in awarding attorneys' fees and costs. Because petitioners are eligible for attorneys' fees even when they do not receive compensation, 42 U.S.C. § 300aa—15(e), counsel for virtually every petitioner in the Vaccine Program requests fees. The undersigned has awarded attorneys' fees more than 300 times in a variety of circumstances.

The amount awarded in attorneys' fees ranges over a spectrum depending upon various factors. One readily useful measuring tool is the case's procedural complexity. Generally, the procedural complexity of a case corresponds to the amount of attorneys' fees. See Rodriguez v. Sec'y of Health & Human Servs., 632 F.3d 1381, 1385 (Fed. Cir. 2011) (case difficulty is reflected by the reasonable number of attorney hours expended). Cases that are appealed after a hearing sit at the highest end of the spectrum, as they will usually have higher attorneys' fees than cases that are resolved without an appeal. Cases that are resolved after experts testify at a hearing, but without an appeal, fall in the middle. Cases with typically still less attorneys' fees are those in which the parties retain experts but the case settles without a hearing. Cases at the lowest end are those that resolve even without an expert report.

For cases that are completed without an expert report, the undersigned has found that the median amount of attorneys' fees and costs is approximately $17,500.[2] The median amount of attorneys' fees is approximately $16,500 and the median amount of costs is $2,000.

The submission of an expert report usually moves the case to the next level of procedural complexity. Obtaining an expert report usually (but not always)

---

[2] The median is derived from information from more than 70 cases. The median components are derived from more than 50 cases. In approximately 20 cases, information about the breakdown of fees versus costs is not available. See, e.g., Schmitz v. Sec'y of Health & Human Servs., No. 12-473V, 2013 WL 5631238 (Fed. Cl. Spec. Mstr. Sept. 23, 2013) (awarding $14,251.57 in attorneys' fees and costs in a flu vaccine / GBS case based upon the parties' settlement agreement).

occurs after the special master has conducted many status conferences during which the special master may have informally guided the parties. See Vaccine Rule 5. After a petitioner obtains an expert report, there is usually a status conference to discuss the strengths and weaknesses of that report. If the special master identifies gaps or deficiencies, the special master will often direct the petitioner to obtain a supplemental report. If the petitioner's expert report adequately summarizes the expert's opinions and discloses all the bases for those opinions, then the special master orders the Secretary to retain an expert to respond. Afterward, there is another opportunity for submitting supplemental reports. Finally, as the case is proceeding to a hearing, the attorneys may be required to submit pre-trial briefs. All these steps increase the amount of attorneys' fees and costs.

At this level of complexity --- a case that involves at least one expert report but no hearing --- my review of the relevant fee applications indicates that the median award of attorneys' fees and costs is approximately $35,500. The median amount of attorneys' fees is approximately $26,000 and the median amount of costs is $8,000.[3]

## II. Procedural History, including Application for Attorneys' Fees and Costs

Acting through her attorney, Lisa A. Roquemore, petitioner, Amanda Guerrero, filed this petition on October 11, 2012, alleging that an influenza vaccination administered to her on September 22, 2011, caused her to suffer GBS. Pet. at 11. Ms. Guerrero filed 534 pages of medical records, and an expert report from Dr. Lawrence Steinman (exhibit 10). On November 27, 2012, Ms. Guerrero filed a statement of completion. Respondent never filed a Rule 4 Report.

The parties agreed to pursue a settlement, and accordingly, on December 19, 2012, this case was designated for expedited resolution. Less than four months later, the parties stated that they had reached a tentative agreement to resolve the case informally. A decision adopted the parties' stipulation and awarded a lump sum payment of $165,000 to Ms. Guerrero. Decision, issued July 3, 2013. The case was pending for approximately nine months.

---

[3] Like the median values described in the previous footnote, the figures appear not to add up correctly. The explanation is that the parties have provided different data used to determine the median total award, the median attorneys' fees, and the median amount of costs.

Ms. Guerrero filed the pending application for attorneys' fees and costs on November 26, 2013, seeking a total award of $55,866.31. The attorneys' fees portion is $38,114. Ms. Guerrero's attorney, Ms. Roquemore, charges an hourly rate of $355, and she seeks compensation for 89.3 hours of work on Ms. Guerrero's case. The attorneys' fees component also includes 51.3 hours of paralegal work at a $125 per hour rate. For costs, the largest item is for Dr. Lawrence Steinman. He seeks compensation for 34 hours of work at a $500 hourly rate.[4]

Respondent filed an opposition to petitioner's application on January 14, 2014. Respondent primarily argues that petitioner's request is excessive because the case was relatively straightforward, and the amount sought by petitioner far exceeds what is typical for comparable cases. The Secretary presented her assessment of average attorneys' fees and costs in similar cases.[5] Resp't's Opp'n at 1.

Following the submission of the Secretary's opposition, a status conference was held to discuss the fee application and the objections to it. The undersigned encouraged the attorneys to attempt to compromise and proposed an amount that might be reasonable for both sides to accept.

The parties did not resolve their dispute. Therefore, on February 26, 2014, Ms. Guerrero filed a reply to respondent's opposition. Ms. Guerrero defends the amount requested, stating that the case was not straightforward because her diagnosis was initially unclear. Further, Ms. Guerrero contends that the fees incurred were reasonable because Ms. Roquemore was a zealous advocate. Pet'r's Reply at 4-6. Ms. Guerrero also indicates she incurred $9,991.40 in fees and costs between filing the initial fee application and the current date. Reply at 19.

### III. Analysis

#### A. Attorneys' Fees

Ms. Guerrero incurred the requested attorneys' fees and costs while prosecuting a claim that a flu vaccine caused her GBS. The allegation the flu

---

[4] The other components of the costs category include $320.67 in attorney's costs and $431.64 for petitioner's unreimbursed litigation costs. The costs are $17,752.31 in total.

[5] The figures from the Secretary differ from the median values presented in this decision, but the difference is not very significant.

vaccine caused GBS is perhaps the single most common claim in cases filed since 2009.  A primary task is for the petitioner to file medical records.  After the medical records are complete, the parties often discuss an informal resolution.  The vast majority of flu-GBS cases settle before either petitioner or respondent submits an expert report.  Petitioners' attorneys with experience in the Vaccine Program routinely proceed without an expert in flu-GBS cases.

Although Ms. Guerrero's case was a flu-GBS case, it contained one factor increasing its complexity.  She retained an expert, Dr. Steinman.

Consequently, measured by procedural complexity, Ms. Guerrero's case falls someplace between "group one" cases (cases having no expert and no hearing) and "group two" cases (cases having an expert report and no hearing).  Within this range, Ms. Guerrero's case resembles a group one case more than a group two case.  It was simple enough that no status conferences were held, and the Secretary did not file a Rule 4 report.  Further, the case resolved within nine months of the filing of the petition.  These aspects make Ms. Guerrero's case similar to a "group one" case.

In addition, except for the retention of an expert, Ms. Guerrero's case differs from a usual "group two" case.  The procedural history of cases with an expert frequently includes multiple status conferences.  The petitioner's attorney spends time preparing for and attending those status conferences.  Ms. Roquemore did not attend any status conferences for Ms. Guerrero's case.  In "group two" cases, after the Secretary files an expert report, the petitioner's attorney often obtains a supplemental expert report, spending time to work with the expert in that process.  Ms. Roquemore did not do that for Ms. Guerrero.  A final factor present in some "group two" cases is that the attorneys file pre-trial briefs.  The undersigned's standard order for pre-trial briefs is designed to help the attorneys present a comprehensive memorandum through which they can advocate for their client.  Ms. Roquemore did not spend any time on what can be a lengthy task.  Thus, many of the features associated with "group two" cases that contributes to them having more attorneys' fees than "group one" cases are absent in Ms. Guerrero's case.

However, whether Ms. Guerrero's case fits the "group one" category or the "group two" category exactly is not the real issue.  The amount requested for attorneys' fees and costs far exceeds the median values for either group one or group two cases, as presented in the following chart.

| Median Values for Attorneys' Fees and Costs Compared to Ms. Guerrero's Requested Attorneys' Fees and Costs | | | |
|---|---|---|---|
|  | Group One Cases (no expert) | Ms. Guerrero's Case | Group Two Cases (expert but no hearing) |
| Attorneys' Fees and Costs | $17,500 | $55,866 | $34,500 |
| Attorneys' Fees | $17,000 | $38,114 | $26,000 |
| Costs | $ 2,000 | $17,752 | $ 8,000 |

To some extent, Ms. Guerrero appreciates that the requested fees exceed the median values as presented in the Secretary's motion. However, Ms. Guerrero complains that these "bottom line" figures do not reproduce the two individual factors that comprise the lodestar value, the attorneys' hourly rate and the number of hours. She suggests that her higher than average fee request is attributable to the first component, Ms. Roquemore's relatively high hourly rate. Ms. Guerrero further maintains that to the extent Ms. Roquemore spent more time on this case than in an average case, the complexity of her case justifies Ms. Roquemore's time.

Preliminarily, Ms. Guerrero is correct that the median values of attorneys' fees do not provide the information necessary to perform an absolutely precise "apples to apples" comparison. Although knowing the median number of hours spent by an attorney would be helpful, this level of detail is not available for practical reasons. The most basic reason is that most decisions awarding attorneys' fees do not routinely set forth the number of hours for which the attorney is being compensated. See, e.g., Swift v. Sec'y of Health & Human Servs., No. 13-763V, 2014 WL 2919710 (Fed. Cl. Spec. Mstr. June 5, 2014) (awarding $16,000 in attorneys' fees and costs in a case involving the flu vaccine and GBS); Monteleone v. Sec'y of Health & Human Servs., No. 12-461V, 2014 WL 1991792 (Fed. Cl. Spec. Mstr. April 21, 2014) (awarding $20,656.41 in attorneys' fees and costs in a case involving the flu vaccine and GBS). Moreover, "the number of hours for which the attorney is being compensated" can be quite complex because different

7

law firms use different staffing models. One firm, such as the Conway, Homer & Chin-Caplan firm, may staff a case with a senior attorney, an associate attorney, and a mix of paralegals and law clerks. Other firms, including Ms. Roquemore's firm, have one attorney and one paralegal. Still other firms include just one attorney, who functions without paralegal support. There may be other staffing models as well. See Caves v. Sec'y of Health & Human Servs., No. 07-443V, 2012 WL 6951286, at *4 (Fed. Cl. Spec. Mstr. Dec. 20, 2012) (identifying attorneys with different staffing models), mot. for review denied, 111 Fed. Cl. 774 (2013); Whiffen v. Sec'y of Health & Human Servs., No. 03-1223V, 2010 WL 5558348 (Fed. Cl. Spec. Mstr. Dec. 15, 2010) (describing different law firm practices for cases in the autism omnibus proceeding). Any attempt to delineate these variables into what has previously been a relatively routine decision would needlessly complicate the work of special masters.

Additionally and more importantly, judicial officials are not required to reproduce this level of detail in their decisions awarding attorneys' fees. According to the Supreme Court, trial courts may take into account their overall sense of a suit, and may use estimates in calculating attorneys' fees and allocating an attorney's time. Fox v. Vice, 131 S.Ct. 2205, 2216 (2011). The Court emphasized that "[t]he essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection." Id.

Because courts awarding attorneys' fees may use their overall sense of the litigation to fashion reasonable awards, the median values of attorneys' fees awards in cases comparable to Ms. Guerrero's case are an appropriate point for analysis. See Broekelschen v. Sec'y of Health & Human Servs., 102 Fed. Cl. 719, 732 (2011) ("it is appropriate to look at fee awards in other cases to aid in determining whether the instant fee award is reasonable and within the discretion of the special master"). Ms. Guerrero, as mentioned above, maintains that the any consideration of other cases requires adjustment with request to both the reasonable hourly rate and the reasonable number of hours. These aspects are discussed below.

*Reasonable Hourly Rate*

Ms. Guerrero notes that because Ms. Roquemore has routinely been compensated at a relatively high hourly rate ($355.00), her invoice will necessarily be higher than an attorney who spent the same amount of time but at a lower hourly rate ($250.00). Pet'r's Reply at 10-11. Mathematically, Ms. Guerrero is

8

correct. When the number of hours is held constant, Ms. Roquemore's fee is more than $9,000 higher than an attorney who charges $250 per hour.

|  | Hours | Hourly Rate | Total |
|---|---|---|---|
| Ms. Roquemore | 89.3 | $355 | $31,701.50 |
| Hypothetical Attorney | 89.3 | $250 | $22,325.00 |
| Difference |  |  | $9,376.50 |

*Percentage difference: 42%*

Although Ms. Roquemore's relatively high hourly rate accounts for some of the difference between the fees requested in Ms. Guerrero's case and the median amount of fees awarded in cases of comparable complexity, her hourly rate does not explain everything problematic about her requested fees in this case. Other attorneys in the Vaccine Program are compensated at rates that are the same as (or very close to) Ms. Roquemore's hourly rate. These attorneys have litigated cases included in the calculation of median award. Thus, the other aspect of the lodestar formula, the reasonable number of hours must be considered.

### *Reasonable Number of Hours*

As for the number of hours, Ms. Guerrero makes three basic points. An overarching theme is that the amount of time Ms. Roquemore spent must be reasonable because Ms. Roquemore decided it was. In addition, Ms. Guerrero argues that even if her case were procedurally simple, it was medically complex, and this complexity justifies additional time. Finally, Ms. Guerrero both answers the examples of inefficiencies as alleged by the Secretary and argues against any other reductions in the absence of a specific criticism by the Secretary.

### Attorneys' Discretion

Ms. Guerrero argues that her attorney has an ethical obligation to represent her zealously and, therefore, the attorney should determine how much time is reasonably necessary to prosecute the action. Pet'r's Reply at 6 (citing Holton v. Sec'y of Health & Human Servs., 24 Cl. Ct. 391, 398 (1991)).

This argument rests on two flawed premises. First, the argument that the attorney should determine the reasonableness of time spent on the case conflicts

9

with the statute. The Vaccine Act authorizes special masters (and the court) to award reasonable attorneys' fees. 42 U.S.C. § 300aa—15(e). <u>Saxton</u>, which the Federal Circuit decided after <u>Holton</u>, demonstrates that special masters are not required to defer to the petitioner's attorney's idea of reasonableness. Special masters need not accept an attorney's representation that the time was well spent, regardless of the attorney's sincere and good faith belief that it was.

Second, Ms. Guerrero's argument equates hours worked with hours billed. However, the Supreme Court indicated that an attorney's ethical duty when submitting a fee application is to exclude hours worked that are "excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from [her] fee submission." <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433 (1983). By mentioning the ethics of private practice in the context of ways to evaluate fee requests, the Supreme Court seems to be indicating that attorney ethics are not incompatible with reduced fee awards.

While the attorney's sense of ethics may compel the attorney to perform certain tasks in zealous advocacy, the attorney's ethical precepts require her to consider carefully the extent to which an attorney bills for all the work performed. "When scrutinizing the actual hours reported, the [trial] court should distinguish 'raw' time from 'hard' or 'billable' time to determine the number of hours reasonably expended." <u>Ramos v. Lamm</u>, 713 F.2d 546, 553 (10th Cir. 1983). "It does not follow that the amount of time actually expended is the amount of time reasonably expended." <u>Copeland v. Marshall</u>, 641 F.2d 880, 891 (D.C. Cir. 1980). Ms. Roquemore seems either not to have exercised billing judgment by eliminating entries that were excessive, or did exercise billing judgment and found that all her entries were reasonable.[6]

Complexity of Ms. Guerrero's Case

Ms. Guerrero argues, without citing any medical records, that her case was not as straightforward as it appeared because her medical records identified two other possible causes for her GBS, an infection with the cytomegalovirus ("CMV") and an infection with the Epstein Barr virus ("EBV"). Pet'r's Reply at 5.

---

[6] Other attorneys demonstrate their use of billing judgment by listing "no charge" for some entries. But, Ms. Roquemore's timesheets do not have any similar notation. In addition, Ms. Roquemore argues "the amount of time my paralegal and I spent . . . was within the realm of reasonableness." Pet'r Reply, filed Feb. 26, 2014, at 12.

10

Some evidence supports Ms. Guerrero's position, particularly regarding CMV.[7] She tested positive for antibodies associated with a CMV infection, exhibit 1 at 14, and her doctors considered reactivation of the CMV infection as a potential cause for her neurologic problems, exhibit 1 at 208 (discharge report), 244. The CMV infection demonstrates that, sometimes, a procedurally simple case hides within it a medically challenging case. Thus, it was reasonable for Ms. Roquemore to spend some additional time, including time with Dr. Steinman preparing a report.

On the other hand, Ms. Guerrero cannot assume that the procedurally simple cases to which her case is being compared were also medically simple. The median values presented in this decision come from dozens of cases reflecting a range of medical complexity. The presence of a CMV infection cannot account for a fees request that is twice as high as average.

Similarly, Ms. Guerrero makes much of her retention of Dr. Steinman. Although a majority of flu vaccine / GBS cases resolve with the payment of some compensation to the petitioner without an expert report, Ms. Guerrero will not be penalized for obtaining a report.[8] Ms. Roquemore spent 6.2 hours for assisting with the preparation of Dr. Steinman's report. Pet'r's Reply at 12. The fee associated with this task is $2,201.00 (6.2 hours times $355 per hour). This amount is credited in full.

Alleged Inefficiencies

In the Secretary's opposition to Ms. Guerrero's fee application, the Secretary identified a few specific tasks that took more time than could be expected reasonably. Resp't's Opp'n at 4-5. Ms. Guerrero's third argument responds to these challenges. In addition, she contends that the Secretary's more general objection to the amount of time "without more specificity[,] should not be accepted, especially in light of [Ms. Roquemore's] detailed invoices." Pet'r's Reply at 9.

---

[7] The potential role of EBV is less clear as an initial test was positive but a later test was negative. Exhibit 1 at 15, 91.

[8] Special masters have attempted to inform attorneys representing petitioners that they do not need to incur the costs of retaining an expert in flu vaccine / GBS cases. Special masters have talked about this topic at Judicial Conferences and communicated their expectations in the Guidelines for Practice under the National Vaccine Injury Compensation Program (Rev. 2014), Section II, Chapter 3. In light of this guidance, Ms. Roquemore is advised that retention of expert witnesses in routine flu vaccine / GBS cases may not be a cost reasonably incurred.

11

As noted above, in determining the reasonable fees to award, a line-by-line analysis of an attorney's timesheet is not required.  Ms. Roquemore spent an unreasonable amount of time on a multitude of tasks to the effect that small incremental charges contributed to a submission in which Ms. Guerrero's fee request exceeds median fee awards by a large margin.  Something for which Ms. Roquemore is charging 0.3 hours can be reasonably accomplished in 0.1 hours.  Something for which she is charging 1.0 hours can be reasonable accomplished in 0.3 hours.  Something for which Ms. Roquemore spent 0.5 hours may have been redundant and, therefore, unnecessary.  It would take a long time to identify all the places, and it is neither required nor appropriate to expend the judicial resources to do so.

## Overall

Ms. Roquemore got medical records, summarized them, prepared a petition, and settled the case.  For cases of this complexity, petitioners routinely request and are awarded fees in the $10,000 to $20,000 range.  Even allowing for the retention and work with Dr. Steinman, the present fee request is almost double that range.  It is unreasonable.

In the undersigned's experience, an experienced and efficient attorney could have accomplished the same result in Ms. Guerrero's case by spending about half as much time.  However, the undersigned is cognizant that the reasonable number of hours encompasses a range and that a number at the higher end of the reasonable range is still within the reasonable range, that is, a high number may still be reasonable.  In addition, as acknowledged above, Ms. Roquemore should be compensated for all her work in retaining Dr. Steinman in this case, even though such efforts may not be viewed as reasonable in other flu vaccine / GBS cases.  Consequently, the undersigned exercises discretion to reduce the overall number of hours by one-third.

The lodestar determination is presented in the following chart.

| Lodestar Calculation | | | | |
|---|---|---|---|---|
| | Requested Hours | Awarded Hours | Hourly Rate | Subtotal |
| Ms. Roquemore | 89.3 | 59.83 | $355 | $21,239.65 |
| Paralegal | 51.3 | 34.37 | $125 | $4,296.25 |
| TOTAL | | | | $25,535.90 |

Although this amount is reduced from the amount requested, $25,535.90 remains a relatively high (but reasonable) amount for Ms. Guerrero's case. It is also approximately 50 percent greater than the median amount of attorneys' fees awarded in cases that resolve without an expert ($17,000).

### B. Fees for Litigating Fees

After Ms. Guerrero filed her initial motion requesting $38,114.00 in attorney' fees, her attorney spent additional time. An unusual aspect was that Ms. Guerrero formally opposed the Secretary's motion for leave to file her opposition to the fee application out of time. After the Secretary was permitted to file an opposition late, the attorneys attempted to reach a compromise. Ms. Guerrero's attorney also spent time in preparing the reply brief and accompanying exhibits. For this work, often known as "fees for fees," Ms. Guerrero seeks an additional $9,991.40. Fee Exhibit 24; Pet'r's Reply at 19. The Secretary did not address this request.

A party that benefits from a fee-shifting statute may be compensated for time spent in fee disputes, at least as an initial matter.[9] Although Ms. Guerrero

---

[9] The availability of fees for appellate litigation over fee requests is less clear. In a case involving the Equal Access to Justice Act, the Federal Circuit indicated that the disappointed fee-litigant's appellate fees would be proportionate to the degree of success in the appeal. Wagner v. Shinseki, 640 F.3d 1255, 1261 (Fed. Cir. 2011). In an unpublished and non-precedential order, the Federal Circuit denied attorneys' fees to a petitioner from the Vaccine Program who did not achieve any success before the Federal Circuit. See Rodriguez v. Sec'y of Health & Human Servs., No. 06-559V, 2013 WL 1189451, at *3-4 (Fed. Cl. Spec. Mstr. March 1, 2013), citing

13

may have received more fees had she compromised as suggested in the February 3, 2014 status conference and not incurred additional fees in pursuit of all she had requested initially, she should not be penalized for refusing to compromise, especially when the Secretary could have been the intransigent party. Ms. Guerrero spent a reasonable amount of time in defending the fees. She presented a well-argued reply. Consequently, Ms. Guerrero is awarded the full amount of fees requested for litigating fees.

### C. Costs

The petitioner's burden of proof to demonstrate "reasonableness" applies equally to costs as well as attorneys' fees. Perreira v. Sec'y of Health & Human Servs., 27 Fed. Cl. 29, 34 (1992), aff'd, 33 F.3d 1375 (Fed. Cir. 1994).

Ms. Guerrero requests reimbursement of attorneys' costs totaling $17,320.67. The contested aspect concerns Dr. Steinman's invoice, $17,000.00. The non-contested costs concern relatively routine items, such as the filing fee and the charges for obtaining medical records.

The chart regarding median values for a sample of attorneys' fees and costs decisions, which appears on page 7 above, presents what average costs are in two different situations. In the group one cases (cases without an expert report), the median value for costs is $2,000. These costs are the routine costs of the filing fee and obtaining medical records. In the group two cases (cases with an expert report), the median value for costs is $8,000. The difference is $6,000. Because the petitioners in group two cases also incur the routine costs, the difference between the two sets of cases is attributable to the expert. This inference is supported by the fact that experts often request retainers of $5,000.

Dr. Steinman's requested fee ($17,000) is approximately three times greater than the median value for an expert report. Is this reasonable?

The fee for an expert is calculated using the same process as the fee for an attorney. Caves v. Sec'y of Health & Human Servs., 111 Fed. Cl. 774, 779 (2013). A lodestar amount is determined by multiplying a reasonable hourly rate for the expert by the reasonable numbers of hour for the expert. Here, Dr. Steinman seeks

---

Federal Circuit order dated February 17, 2012. However, a judge held that extrapolating from these Federal Circuit actions to the Vaccine Program was erroneous. Masias v. Sec'y of Health & Human Servs., 106 Fed. Cl. 700, 704 (2012).

an hourly rate of $500 per hour and requests compensation for 34 hours of work. Fee Exhibit 7. The Secretary challenges both aspects. Resp't's Opp'n at 5.

*Reasonable Hourly Rate*

To determine a reasonable rate for an expert, special masters have typically considered factors similar to the factors used in setting an hourly rate for an attorney. These factors include the expert's education, training, experience, board certifications, academic affiliations, publications, experience in the Vaccine Program as reflecting an efficient use of time, and geographic location as relevant to the cost of living. Other factors include the prevailing rates for comparable experts and rates traditionally charged by similar experts in the Vaccine Program. See Sabella v. Sec'y of Health & Human Servs., 86 Fed. Cl. 201, 206 (2009). These considerations were used to find, in 2008, that a reasonable hourly rate for work as a medical expert performed by Marcel Kinsbourne, a pediatric neurologist, after December 2006, was $500 per hour. Simon v. Sec'y of Health & Human Servs., No. 05-941V, 2008 WL 623833, at *8 (Fed. Cl. Spec. Mstr. Feb. 21, 2008).

In support of Dr. Steinman's requested rate, Ms. Guerrero has submitted various items of evidence. She included a report from Julian M. Loube from Loube Consulting. Dr. Loube addressed his report to an attorney who represented petitioners in two other cases in the Vaccine Program and opined that a reasonable hourly rate for the expert who testified for the petitioners in those two cases, Dr. M. Eric Gershwin, was, in 2009, $500.00. Fee Exhibit 8. In addition, Ms. Guerrero filed biographical information from Dr. Utz, Dr. Latov as well as Dr. Saxon (exhibits 9-11) and further suggests the rate that these doctors charge supports the $500 hourly rate Dr. Steinman has requested.

On the other hand, the Secretary has done relatively little to respond to this evidence about a reasonable hourly rate for an expert. In the context of objecting to the proposed $500 per hour rate, the Secretary simply argues "[t]his court previously awarded Dr. Steinman a rate of $425.00 per hour." Resp't's Opp'n at 5, (citing Broekelschen v. Sec'y of Health & Human Servs., No. 07-137V, 2008 WL 5456319, at *9-11 (Fed. Cl. Spec. Mstr. Dec. 17, 2008)).

At a minimum, the rate awarded in 2009 for work performed in 2008 should be increased to account for inflation. See Sabella, 86 Fed. Cl. at 219 ("at some point using hourly rates for earlier years could become unreasonable"). According to the Bureau of Labor Statistics, $425 in 2008 has the same buying power as approximately $455 in 2012, when Dr. Steinman performed the work for Ms.

15

Guerrero.  Thus, the question is whether Ms. Guerrero has met her burden in submitting evidence to increase Dr. Steinman's hourly rate from $455 to $500.

The information from Dr. Saxon is persuasive.  Ms. Guerrero submitted a letter from him indicating that in 2008, Dr. Saxon began charging $540 per hour for consultations and $780 per hour for testimony.  Fee Exhibit 11.  If Dr. Saxon was charging that much in 2008, it seems reasonable to infer that four years later, Dr. Saxon was charging at least that much.  If so, Dr. Steinman's request that he be compensated at $500 per hour rate for work performed in 2012 is also reasonable.[10]

*Reasonable Number of Hours*

Dr. Steinman's invoice indicates that he spent 34 hours working on this case.  His specific activities can be divided into three broad categories, although the categories are not completely separate from each other.  The categories and the approximate amount of time spent on the task are:  reviewing records (13.25 hours), collecting articles and researching (11.25 hours), and writing the report (9.5 hours).  Fee Exhibit 7.

Dr. Steinman's hours are excessive, although, much like the issue with Ms. Roquemore's hours, identifying precisely which hours exceed a reasonable limit is difficult to say.  For example, Dr. Steinman spent 9.50 hours writing his report, which is 22 pages, excluding one page of bibliographic information.  At first blush, it may appear that 9.5 hours is a relatively short amount of time to write 22 pages.  However, this conclusion would be superficial.

Approximately nine pages of Dr. Steinman's report in Ms. Guerrero's case (pages 3-6, 7-11) are copied from a report Dr. Steinman wrote in another case, Dillon v. Sec'y of Health & Human Servs., No. 10-850V.  Pages 7 and 15-20 mostly reproduce portions of Ms. Guerrero's medical records.  Pages 13-14 and 21 mostly reproduce excerpts copied and pasted from two journal articles.

---

[10] Dr. Loube's 2009 report about Dr. Gershwin's rate did not factor into the analysis.  Dr. Loube's report references two cases and the undersigned was the presiding special master in both.  A review of those old cases has produced no indication that the petitioner actually filed Dr. Loube's report in either of those cases.  The decision in one of those cases set Dr. Gershwin's hourly rate without mentioning a report from Dr. Loube.  Barber v. Sec'y of Health & Human Servs., No. 99-434V, 2008 WL 4145653, at *25 (Fed. Cl. Spec. Mstr. Aug. 21, 2008).  Thus, it is not entirely clear that the Secretary had notice, in 2009, of Dr. Loube's opinion.

On the other hand, a future report from Dr. Loube could constitute persuasive evidence about a reasonable hourly rate for an expert.  Before Dr. Loube's opinion would be considered, the Secretary would have to have a fair opportunity to respond.

Thus, the amount of fresh work performed by Dr. Steinman in this matter is actually contained in fewer than six pages. Specifically, pages 1-2, a portion of page 6, pages 11-12, one paragraph carrying over from page 17-18, and a small amount on pages 20, 21 and 22 are places where Dr. Steinman presented new analysis. Spending approximately nine hours to write six pages seems high for a person of Dr. Steinman's accomplishments.

Similarly, although Ms. Guerrero notes that Dr. Steinman cited 13 articles in his report, see Pet'r's Reply at 17, Dr. Steinman cited four articles in Dillon and a fifth article, the Langmuir epidemiologic study on the swine flu vaccine and GBS from 1984, is well-known. Thus, the number of articles new to Ms. Guerrero's case is actually no more than eight. Is it reasonable for an experienced neuro-immunologist to spend 11.25 hours to locate and to read eight additional articles?

Finally, there is a question about 13.25 hours for Dr. Steinman to read Ms. Guerrero's medical records. There is really no hard and fast metric for judging the amount of time required to review medical records. Even the number of pages can be misleading for a variety of reasons.

Overall, my experience suggests that a reasonable number of hours for the production of a report in Ms. Guerrero's case is 25 hours. The total amount of compensation for Dr. Steinman's work is $12,500 ($500 per hour times 25 hours).[11]

## IV. CONCLUSION

Ms. Guerrero has established that a reasonable amount of attorneys' fees is $35,527.30 ($25,353.90 + $9,991.40). A reasonable amount for attorneys' costs is $12,820.67 ($12,500.00 + $320.67). A check should be made payable to Ms. Roquemore and Ms. Guerrero in the amount of $48,347.97.

Ms. Guerrero has also established that a reasonable amount of her costs is $431.64. A check should be made payable to Ms. Guerrero for this amount.

The Clerk's Office is instructed to issue a judgment in the amount of $48,779.61, unless a motion for review is filed.

---

[11] The amount awarded for Dr. Steinman ($12,500) can be looked at two ways. It is about three quarters of the requested amount ($17,000). It is also slightly more than twice as much as the average expert report costs ($6,000).

**IT IS SO ORDERED.**

s/ Christian J. Moran  
Christian J. Moran  
Special Master